UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK a/k/a
DZ BANK AG DEUTSCHE ZENTRAL-
GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN, NEW YORK
BRANCH a/k/a DZ BANK AG DEUTSCHE
ZENTRAL-GENOSSENSCHAFTSBANK,
FRANKFURT AM MAIN a/k/a DZ BK AG
DEUTSCHE ZENTRA NY BR a/k/a
DZ BANK AG a/k/a DZ BANK,

      Plaintiff,

v.                                      CASE NO. 3:10-cv-222-J-MCR

MICHAEL MCCRANIE a/k/a
MICHAEL J. MCCRANIE,

      Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    This action for damages came before the Court for a bench trial on October 14 and 15, 2014.  After reviewing the parties' proposed findings of fact and conclusions of law, the Court is now prepared to decide the case.

## I.  Procedural History

    On March 11, 2010, Plaintiff DZ Bank initiated this action for breach of a promissory note against Defendant Michael McCranie.  (Doc. 1-4.)  On September 13, 2010, this case was reassigned to the undersigned upon the parties' consent.  (Docs. 23, 24.)  On August 31, 2011, the Court entered an

Order granting DZ Bank's first Motion for Summary Judgment and denying McCranie's first Motion for Summary Judgment.  (Doc. 71.)  On September 29, 2011, the Court entered Judgment in favor of DZ Bank and against McCranie for the sum of $484,425.42, plus pre- and post-judgment interest, attorney's fees, and costs.  (Doc. 76.)  McCranie appealed the Judgment and the Court's Order of August 31, 2011.  (Doc. 77.)

On March 21, 2013, the Eleventh Circuit Court of Appeals reversed and remanded the case for further proceedings.  (Doc. 79.)  Following the remand, the Court allowed the parties to engage in additional discovery.  In November 2013, the parties filed their Cross-Motions for Summary Judgment, both of which were denied on March 18, 2014.  (Docs. 109, 118, 138.)  On June 30, 2014, DZ Bank filed its First Amended Complaint, to which McCranie responded on September 24, 2014.  (Docs. 151, 156.)  On October 14 and 15, 2014, the case came before the Court for a bench trial.  (Docs. 163, 164.)  On November 20, 2014, the parties filed their annotated proposed findings of fact and conclusions of law.  (Docs. 170, 171.)

## II.  Findings of Fact

1.      On or about October 30, 2000, McCranie,[1] as purchaser, and Brooke

---

[1] McCranie has been in the insurance business since 1984, buying and selling "many independent [insurance] agencies."  (Trial Tr. Vol. 2, 192:16-193:2.)

Corporation ("Brooke"),[2] as seller, entered into an "Agreement for Sale of Agency Assets" for the purchase of a Brooke franchise insurance agency in Live Oak, Florida, for the sum of $1,045,000, which "has been or will be purchased by [Brooke] on October 30, 2000, from First South, Inc. and First South Insurors LLC."[3]  (Pl.'s Ex. 1; Trial Tr. Vol. 1, 32:15-33:4; Trial Tr. Vol. 2, 187:7-188:7.)  The parties agreed, *inter alia*, that McCranie would "not terminate its Franchise Agreement with [Brooke] prior to five (5) years from the closing date."  (Pl.'s Ex. 1, § 5.)  The parties also agreed that Brooke's "directors, officers and employees [would] assist and cooperate with [McCranie] in transferring to [McCranie] the agency assets conveyed under the terms of this Agreement."  (*Id.* at § 8.)  The parties further agreed that certain exhibits, including the Bill of Sale, the List of Office Equipment and Other Personal Property, the Franchise Agreement, the Agreement for Purchase of Agency Assets (from First South, Inc. and First South Insurors LLC d/b/a First South Insurance), and the Listing of Obligations Assumed by Purchaser, were "an integral part" of the Agreement.  (*Id.* at § 14(B).)

  2. The Franchise Agreement was also entered on October 30, 2000

---

[2] "Brooke [was] primarily in the business of providing certain services and assistance to businesses selling insurance[.]" (Def.'s Ex. 13 at 1.)

[3] Earlier, on September 12, 2000, Brooke, as buyer, had entered into an Agreement for Purchase of Agency Assets with the two sellers, First South, Inc. and First South Insurors LLC d/b/a First South Insurance, of the same insurance agency. (Def.'s Ex. 19.)

3

between Brooke, as franchisor, and Home Options Financial Group LLC ("Home

Options"), by and through McCranie, as franchisee, whereby Home Options

became a franchisee of Brooke for the purpose of issuing insurance policies.

(Trial Tr. Vol. 2, 235:21-23; Def.'s Ex. 13.)  Under its terms, Brooke became the

Agent of Record, *i.e.*, the "[p]erson designated on Company's records as the

agent or representative regarding a specific Policy and the owner of all Sales

Commissions."  (Def.'s Ex. 13, ¶ 1.2.)  Brooke's obligations included providing

"services with respect to accounting for and processing of Policies for Franchise

Agent."  (*Id.* at ¶ 2.1.)  Brooke had "the absolute right to and [was] fully vested in

all Net Premiums.  Franchise Agent ha[d] no right, title or interest in such

amounts."  (*Id.* at ¶ 2.3(a).)  Brooke was required to "calculate and credit

Franchise Agent Account monthly for amounts due Franchise Agent by Brooke,"

which amounts "shall be Eighty-five percent (85%) of any Sales Commissions

from Companies for Customer Accounts."  (*Id.* at ¶ 2.4.)

The Franchise Agreement authorized the creation of a Receipts Trust

Account, "established and owned by Brooke, but controlled by a trustee, to which

premiums, fees, Sales Commissions and Other Receipts received by Franchise

Agent or Brooke from Companies or customers shall be deposited and from

which Brooke, or its designee, makes regular withdrawals by Electronic Funds

Transfer."  (*Id.* at ¶¶ 1.15, 7.1.)  The Trustee had the "sole right to withdraw funds

from the Receipts Trust Account" and was required to "distribute to Franchise

4

Agent and/or Brooke Sales Commissions and Other Receipts in accordance with the terms of the Trust Agreement."  (*Id.* at ¶ 7.2.)

The Franchise Agreement directed the Franchise Agent to "change the Agent of Record for all existing Customer Accounts to Brooke," subject to prior approval of the Companies involved (*id.* at ¶ 3.3), and "for all Policies sold, renewed, serviced or delivered through Franchise Agent with an effective date for coverage after the effective date of this agreement, unless prior written approval is obtained from Brooke" (*id.* at ¶ 3.5), as well as to "process all applications for Policies exclusively through the facilities of Brooke" (*id.* at ¶ 3.4).  The Franchise Agent agreed and acknowledged that "by making Brooke the Agent of Record, all Sales Commissions and Profit Sharing Commissions [were] assigned to Brooke for accounting and distribution to Franchise Agent Account" and Brooke was appointed as Franchise Agent's "attorney in fact to endorse or deposit checks made payable to Franchise Agent by customers, Companies or master general agents."  (*Id.* at ¶ 3.5.)

The Franchise Agreement also provided:

3.7    Franchise Agent shall be solely responsible for the collection of all Agency Bill Policy premiums from Customer Accounts, which amounts shall be made payable to [Brooke].  Franchise Agent shall not have authority to endorse or deposit such payments to its own account. . . .
3.8    Franchise Agent shall be responsible for payment to Brooke of all Agency Bill Policy net premiums and Direct Bill Policy return commission resulting from Customer Accounts.
3.9    Franchise Agent authorizes Brooke to retain Fifteen percent

5

(15%) of any Sales Commissions from Companies under contract
with Brooke for Customer Accounts . . . .

(*Id.* at ¶¶ 3.7-3.9.)

The term of the Franchise Agreement was five years, but it was subject to

renewal at expiration.  (*Id.* at ¶ 6.1.)  The Franchise Agent had "the unilateral right

to terminate this Agreement for any reason upon not less than 30 days advance

notice to Brooke."  (*Id.* at ¶ 6.4.)  Upon termination of the Franchise Agreement,

Brooke was obligated to "request the pertinent Companies involved to make the

Franchise Agent the Agent of Record for all Customer Accounts."  (*Id.* at ¶ 6.5.)

Section 9.8 of the Franchise Agreement provided: "This Agreement (including all

Exhibits and Addenda hereto) contains the entire agreement between the parties

hereto and shall supersede and take precedence over any and all prior

agreements, arrangements or understandings between the parties relating to the

subject matter hereof."  (*Id.* at ¶ 9.8.)

3.      To finance his purchase of the insurance agency, on October 30,

2000, McCranie entered into two Promissory Notes with Brooke Credit

Corporation ("Brooke Credit" or "BCC"), now known as Aleritas Capital.  (Pl.'s Ex.

2; Trial Tr. Vol. 1, 33:5-34:3; Trial Tr. Vol. 2, 188:8-189:13, 190:7-9.)  The first

Promissory Note in the sum of $990,000, known as loan number 2244, was to

acquire insurance agency assets, and the second Promissory Note in the sum of

$40,000, known as loan number 2245, was to finance agency operations.  (Pl.'s

Ex. 2.)  These Promissory Notes were signed by both McCranie and a representative of Brooke Credit, they were made payable to Brooke Credit or its successors and assigns, and they referenced the Agreement for Advancement of Loan under "Additional Terms."  (*Id.*)

4.      The Agreement for Advancement of Loan (a/k/a "Advancement Agreement") was also entered on October 30, 2000 between Brooke Credit, as lender, and McCranie, as borrower.  (Pl.'s Ex. 5.)  Under its terms, Brooke Credit agreed to loan to McCranie the sum of $990,000 for the purpose of acquiring insurance agency assets.  (*Id.* at 1.)  It provided that the Agreement and the Loan Documents defined therein "shall apply to all existing and future loans or advances made by [Brooke Credit] to [McCranie]."  (*Id.*)  Loan documents were defined as "[t]his Agreement and all other agreements, instruments and documents, . . . now and/or from time to time hereafter executed by and/or on behalf of [McCranie] and delivered to [Brooke Credit] in connection therewith, including, without limitation, the documents referenced in paragraphs 1 through 11 herein."  (*Id.* at 2.)

With respect to assignment of agency assets, the Agreement for Advancement of Loan provided:

> (a) [McCranie] grants, conveys and assigns to [Brooke Credit] as additional security all the right, title and interest in and to [McCranie's] Agency Assets, including without limitation, [McCranie's] rights, title and interest in and to the Agent Agreement, Subagent Agreements, Agent's Account and Customer Accounts. . .

(b) [McCranie] may collect, receive, enjoy and use the Agency Assets so long as [McCranie] is not in default under the terms of any of the Loan Documents. . . .

(*Id.* at ¶ 12.)

With respect to default, the Agreement provided:

(a)    [Brooke Credit] may upon written notice to [McCranie], declare [McCranie] to be in default if: [McCranie] fails to fulfill or perform any term, condition or obligation set forth in any Loan Document, including without limitations [McCranie's] failure to make payments when due in accordance with the terms of the Note; or, if any representation or warranty set forth in any Loan Document is not as represented or warranted by [McCranie].

(b)    In addition, [Brooke Credit] may upon written notice to [McCranie], declare [McCranie] to be in default upon the occurrence of any of the following events:

  i.    [McCranie's] failure to fulfill, perform or enforce any term, condition or obligation set forth in any agreement by [McCranie] to purchase Agency Assets that are related to or the subject of the Loan Documents;

  ii.    [McCranie's] failure to fulfill, perform or enforce any term, condition or obligation set forth in the Agent Agreement;

  iii.    any representation or warranty set forth in the Agent Agreement is not as represented or warranted by [McCranie];

  iv.    the Agent Agreement is terminated by [McCranie] or Master Agent . . . .

(c)    A default by [McCranie] in performing under the terms of one Loan Document shall constitute a default under the terms of all other Loan Documents.

(d)    A default by [McCranie] in performing the obligations and duties of any contract relating to [McCranie's] business shall constitute a default under the terms of this Agreement.

(*Id.* at ¶ 13.)

With respect to allocation of loan payments, the Agreement for

Advancement of Loan provided:

> [McCranie] hereby agrees that [Brooke Credit] may allocate the payments it receives in any manner which [Brooke Credit] deems necessary.  This allocation may include but is not limited to current loan amounts, any prepayments, and any past due payments which may otherwise place [McCranie] in default.  This discretion also allows [Brooke Credit] to determine whether to apply the loan payment proceeds to interest or principal. [McCranie] hereby further agrees that the allocation of the loan payment proceeds is absolutely within the discretion of [Brooke Credit] and therefore waives any objections that [McCranie] might otherwise express with the allocation amounts.

(*Id.* at ¶ 27.)  Finally, pursuant to the integration clause: "This Agreement (including all exhibits and addenda hereto) together with the other Loan Documents contains the entire agreement between the parties hereto and shall supersede and take precedence over any and all prior agreements, arrangements or understandings between the parties relating to the subject matter hereof."  (*Id.* at ¶ 36.)

5.      Also on October 30, 2000, Brooke Credit, as lender, and McCranie, as borrower, entered into a Security Agreement ("October 30, 2000 Security Agreement"), whereby McCranie gave Brooke Credit additional security in all of his Agency Assets, including inventory, equipment, accounts, rights to payment, and general intangibles.  (Pl.'s Exs. 6 & 22; Trial Tr. Vol. 1, 57:15-57:23, 78:20-79:3; Trial Tr. Vol. 2, 190:4-190:6.)  All terms in the Security Agreement had the same meaning ascribed to them in the Agreement for Advancement of Loan. (Pl.'s Ex. 6.)

6.      On April 11, 2002, Brooke Credit agreed to refinance and consolidate the two Promissory Notes from October 30, 2000.  (Pl.'s Ex. 3; Trial Tr. Vol. 1, 34:4-34:18; Trial Tr. Vol. 2, 193:7-193:13.)  On April 17, 2002, Brooke Credit, as lender, and McCranie, as borrower, entered into a new Promissory Note, known as loan number 2752, under which Brooke Credit loaned to McCranie the sum of $831,407.78 to consolidate pre-existing agency debt at a lower interest rate.  (Pl.'s Ex. 4; Stipulated fact (Doc. 143) #5; Trial Tr. Vol. 1, 35:1-37:8; Trial Tr. Vol. 2, 193:14-194:2.)  This Promissory Note was payable to Brooke Credit or its successors and assigns, and referenced the Agreement for Advancement of Loan dated October 30, 2000 under "Additional Terms."  (Pl.'s Ex. 4.)  A day earlier, on April 16, 2002, McCranie's attorney examined this Note and related documents, and opined that "the [loan] documents constitute[d] a valid, legally binding obligation of [McCranie] enforceable against [him] in accordance with its terms."  (Pl.'s Ex. 5 at 657, ¶ 7; Trial Tr. Vol. 1, 55:21-57:8.)

7.      On August 27, 2004, Brooke Credit, as seller, Brooke Credit Funding, LLC ("Brooke Funding" or "BCF"), as buyer and issuer, and Textron Business Services, Inc. ("Textron"), as initial servicer, entered into a Sale and Servicing Agreement ("Sale Agreement"), for the transfer of certain loans from Brooke Credit to Brooke Funding.  (Pl.'s Ex. 7; Trial Tr. Vol. 1, 42:9-42:14, 42:21-

10

43:8; Zierlein Dep. 38:24-41:25.)[4]  There is no evidence that McCranie's April 17,

2002 Promissory Note was included in the initial Schedule of Loans.  However,

the Sale Agreement provided for the transfer of then-future loans from Brooke

Credit to Brooke Funding upon the parties' agreement.  (Pl.'s Ex. 7, § 2.1(a).)

Although there were certain conditions precedent to transfer, such

conditions could be deemed satisfied.  (*See id.* at § 2.3, bates 044 ("[Brooke

Credit] by accepting the Purchase Price for any purchase hereunder, shall be

deemed to have certified to the Issuer [*i.e.*, Brooke Funding] and the Agent that

the conditions precedent for such Purchase set forth in Section 2.3(a) have been

satisfied. . . . Notwithstanding anything herein to the contrary, the conditions

precedent to any Purchase specified in this Section 2.3(b) shall conclusively be

deemed to have been satisfied on the related Purchase Date unless the Seller

[*i.e.*, Brooke Credit] delivers a written notice to the contrary to each of the Agent,

the Servicer, the Custodian and the Issuer . . . .").)

8.      Also on August 27, 2004, Brooke Funding, as borrower, Brooke

Credit, as seller and subservicer, Brooke, as master agent servicer and

---

[4] The telephonic deposition of Gage Zierlein, a former employee of Brooke Credit, who executed the Allonge mentioned *infra* and who was responsible for transferring McCranie's April 17, 2002 Promissory Note from Brooke Credit to Brooke Funding and then to DZ Bank, took place on August 14, 2014 and was admitted into evidence during the bench trial.  (Trial Tr. Vol. 1, 178:15-178:21.)

11

guarantor, Autobahn Funding Company, LLC ("Autobahn Funding"),[5] as lender, and DZ Bank, as agent for Autobahn Funding, entered into a Credit and Security Agreement ("Security Agreement"), whereby Autobahn Funding agreed to finance Brooke Funding's acquisition of various loans under the Sale Agreement.[6]  (Pl.'s Ex. 8; Trial Tr. Vol. 1, 42:15-42:17, 42:21-43:8; Zierlein Dep. 38:24-41:25.)

To secure Brooke Funding's obligations to Autobahn Funding, Brooke Funding and Brooke Credit granted DZ Bank, as Autobahn's agent, a security interest in: (1) all right, title, and interest in and to various loans that Brooke Funding had purchased from Brooke Credit under the Sale Agreement; (2) all right, title, and interest in and to various loans that Brooke Funding would be purchasing from Brooke Credit in the future under the Sale Agreement; and (3) various other collateral.  (*See* Pl.'s Ex. 8, §§ 2.12-2.13.)  With respect to any loan, the "loan documents" included the original counterpart of the loan and an allonge, the related loan agreement, the related franchise agreement, the related lender protection addendum, the related customer agreement, the related security agreement and financing statement, any related insurance agreements, all guarantees relating to the loan, and "all other instruments, documents and

_____

[5] Autobahn Funding was "a capital markets funding vehicle" without any employees of its own.  (Trial Tr. Vol. 1, 30:2-30:3, 30:14.)

[6] Also on August 27, 2004, DZ Bank filed UCC Financing Statements as to Brooke Funding and Brooke Credit with the Delaware Department of State and Kansas Secretary of State, respectively.  (Pl.'s Exs. 9 & 10; Trial Tr. Vol. 1, 43:9-44:1.)

agreements executed and/or delivered under or in connection with any of the foregoing."  (Pl.'s Ex. 8, bates 571.)

9.      On August 31, 2004, Brooke Credit, as originating lender, and Home Federal Savings and Loan ("Home Federal"), as participating lender, entered into a Participation Certificate and Agreement ("Participation Agreement"), under which Brooke Credit sold a 99.74% interest in McCranie's April 17, 2002 Note to Home Federal.[7]  (Pl.'s Ex. 20; Trial Tr. Vol. 1, 76:14-77:15.)  Pursuant to paragraph 12 of the Participation Agreement, Brooke Credit was allowed to "administer the Loan and any related security and guaranties as though it were the sole owner and holder thereof."  (Pl.'s Ex. 20, ¶ 12.)  Pursuant to paragraph 23, as amended, the transfer was intended to be a true sale; therefore, it could not be revoked, and Brooke Credit could not maintain control over Home Federal's interest in the loan.  (Pl.'s Ex. 26, bates 183.)

Pursuant to paragraph 17, Home Federal acknowledged that "it [had] made an independent investigation of the Loan, and [had] satisfied itself with respect to the credit standing of any Obligor of the Loan, the value of any security for the Loan, the validity and enforceability of the Loan agreement, the Promissory Note and any guaranty and security and all other matters in connection with the Loan."

---

[7] Earlier, on July 8, 2003, Brooke Credit offered to sell McCranie's loan to Home Federal with the understanding that Brooke Credit would repurchase the loan "within one business day of the Participant's request."  (Pl.'s Ex. 26, bates 262-63.)  Home Federal signed the Participation Agreement and returned it to Brooke Credit on July 9, 2003 with effective date of June 16, 2003.  (Pl.'s Ex. 26, bates 174-75.)

(Pl.'s Ex. 20, ¶ 17.)  However, prior to entering into the Participation Agreement, Home Federal did not conduct a UCC search on any of the Brooke entities. (Haskell Dep. 19:22-19:25.)[8]

Home Federal never took possession of McCranie's April 17, 2002 Note (Haskell Dep. 20:6-20:18), and it did not file a UCC Financing Statement regarding its interest in the Note (Haskell Dep. 21:10-21:17).  DZ Bank, who had possession of the Note at the trial and who had filed UCC Financing Statements as to Brooke Funding and Brooke Credit on August 27, 2004 (Pl.'s Exs. 9 & 10; Trial Tr. Vol. 1, 43:9-44:1), was not aware of the Participation Agreement in February 2008 when it funded McCranie's April 17, 2002 Note, and the Participation Agreement did not become a part of DZ Bank's file (Trial Tr. Vol. 1, 57:24-58:14, 66:19-67:6, 76:14-77:3; Zierlein Dep. 35:10-38:13, 155:6-156:9).

10.    On August 29, 2006, Brooke Funding, as issuer, Textron, as initial servicer, and Brooke Credit, as seller, entered into an Amended and Restated Sale and Servicing Agreement ("Amended Sale Agreement"), containing the same relevant provisions as the Sale Agreement.  (Pl.'s Ex. 11.)  Pursuant to Article V, Textron was appointed as the custodian of the loan files for the benefit of DZ Bank.  (*Id.*)  Pursuant to Section 2.5(a), as to any ineligible promissory note sold by Brooke Credit to Brooke Funding and pledged to DZ Bank, DZ Bank

---

[8] The deposition of Scott Haskell, Executive Vice President of Home Federal, took place on August 30, 2013 and was admitted into evidence during the bench trial. (Trial Tr. Vol. 1, 178:15-178:21.)

could compel Brooke Credit to either repurchase the note or substitute it with one or more eligible notes.  (Pl.'s Ex. 11; Trial Tr. Vol. 1, 51:13-51:25.)  DZ Bank did not ask any of the Brooke entities for either repurchase or substitution of McCranie's April 17, 2002 Note, because it did not realize the Note was ineligible for transfer.  (Trial Tr. Vol. 1, 52:1-52:7.)  Nevertheless, the parties contemplated the possibility that ineligible loans could be transferred.  (Trial Tr. Vol. 2, 314:4-315:1, 314:15-315:1; Def.'s Ex. 22 at 8-9 and New Schedule V.)  Pursuant to Section 8.6, only "the parties hereto and their respective successors and permitted assigns, including the Agent on behalf of the Secured Parties pursuant to the Credit Agreement" had "any legal or equitable right, remedy or claim under the Agreement."  (Pl.'s Ex. 11, bates 704; Trial Tr. Vol. 1, 159:12-61:2.)

11.    Also on August 29, 2006, Brooke Funding, as borrower, Brooke Credit, as seller and subservicer, Brooke, as master agent servicer and performance guarantor, Autobahn Funding, as lender, and DZ Bank, as agent for Autobahn Funding, entered into an Amended and Restated Credit and Security Agreement ("Amended Security Agreement"), whereby Autobahn Funding agreed to finance Brooke Funding's acquisition of various loans from Brooke Credit under the Amended Sale Agreement.  (Pl.'s Ex. 12, § 2.04.)  Brooke Funding reaffirmed DZ Bank's security interest in the collateral, namely, (1) all right, title, and interest in and to various loans that Brooke Funding had purchased from Brooke Credit under the Amended Sale Agreement; (2) all right, title, and interest

in and to various loans that Brooke Funding would be purchasing from Brooke Credit in the future under the Amended Sale Agreement; and (3) various other collateral.  (Pl.'s Ex. 12, bates 123-24.)  The Amended Security Agreement contained the same relevant provisions as the Security Agreement.  Any promissory note originated prior to August 30, 2004 was still ineligible to be pledged to DZ Bank.  (*Id.*, bates 114 (purchase of eligible loans only), 096 (defining "eligible loan"), 098 (defining "existing loan").)

12.     On February 19, 2008, Brooke Funding sent a Borrowing Base Certificate to DZ Bank requesting that Autobahn Funding advance $3,901,457 to Brooke Funding under Section 2.02 of the Amended Security Agreement for its purchase of McCranie's April 17, 2002 Note and various other notes from Brooke Credit (the "Advance Request").  (Pl.'s Ex. 13; Trial Tr. Vol. 1, 61:3-63:12.) Pursuant to Section V.A., of the $3,901,457 requested by Brooke Funding, $416,947.14 was requested for Brooke Funding's purchase of McCranie's Note, which represents 81% (the Maximum Advance Rate) of $514,749.55, the outstanding amount on the Note.  (Pl.'s Ex. 13; Zierlein Dep. 19:3-24:8.)

13.     Also on February 19, 2008, Textron certified to DZ Bank in its "Custodian & Servicer's Certificate" that: (1) it was in possession of the original April 17, 2002 Note, the Allonge thereto, and related documents (including the Agreement for Advancement of Loan, the Lender Protection Addendum, the Security Agreement, the Pre-Authorized Collection Form, the Collateral

16

Preservation Agreement, the Credit File, and UCC); and (2) Brooke Credit transferred McCranie's April 17, 2002 Note, among others, and its interest in the collateral securing it, to Brooke Funding pursuant to the Amended Sale Agreement, which Note would be pledged by Brooke Funding to DZ Bank to secure its obligations under the Amended Security Agreement.  (Pl.'s Ex. 14; Trial Tr. Vol. 1, 63:13-65:23; Zierlein Dep. 24:9-33:22.)

14.    On February 20, 2008, in conjunction with Brooke Credit's sale of the April 17, 2002 Note to Brooke Funding under the Amended Sale Agreement, Brooke Credit endorsed the Allonge making the Note payable to Brooke Funding. (Pl.'s Exs. 4 & 14; Trial Tr. Vol. 1, 39:12-40:11, 47:4-47:10; Zierlein Dep. 17:16-19:2.)  The same day, in conjunction with Brooke Funding's pledge of the Note to DZ Bank under the Amended Security Agreement, Brooke Funding endorsed the Allonge making the Note payable to DZ Bank.  (*Id.*)  The Allonge, which expressly references loan number 2752 in the upper right-hand corner, provides: "Pay to the order of [Brooke Funding], its successors and assigns . . . , without recourse (except as otherwise set forth in [the Amended Sale Agreement] . . .). Pay to the order of DZ Bank, its successors and assigns."  (Pl.'s Ex. 4.)  The original April 17, 2002 Note and Allonge thereto were presented at the trial.  (Trial Tr. Vol. 1, 35:25-37:8, 39:5-40:11, 59:5-59:10, 105:1-106:5.)  The Allonge was part of the original file.  (Trial Tr. Vol. 1, 106:4-106:5.)

15.    Also on February 20, 2008, DZ Bank wired Brooke Funding

$3,901,456.68, of which $416,947.14 was for Brooke Funding's purchase of the April 17, 2002 Note from Brooke Credit.  (Pl.'s Ex. 15; Trial Tr. Vol. 1, 65:24-66:15; Zierlein Dep. 33:23-34:22.)  At the time, DZ Bank had no reason to believe that any of the Brooke entities would fail to fulfill their loan obligations, or that McCranie would have any defenses as to enforcement of his Note.  (Trial Tr. Vol. 1, 93:15-94:2, 171:9-171:22; Zierlein Dep. 44:6-45:1, 155:6-156:9.)

16.     On April 15, 2008, Brooke Credit assigned to DZ Bank its UCC Financing Statement regarding McCranie's pledge under the October 30, 2000 Security Agreement.  (Pl.'s Ex. 25; Trial Tr. Vol. 1, 79:25-80:7.)

17.     From 2002 until June 2008, payments on behalf of McCranie were made under the Note as agreed.  (Trial Tr. Vol. 2, 196:13-197:1, 197:21-200:4; Haskell Dep. 25:15-25:22, 26:14-27:19; Pl.'s Ex. 17 ("As of August 31, 2008 the outstanding principal amount of your Loan Obligations was $481,232.18.").)  On or about June 19, 2008, DZ Bank terminated its line of credit with Brooke Funding.  (Def.'s Ex. 22, § 1.9; Trial Tr. Vol. 2, 297:10-298:9.)

18.     Around June of 2008, McCranie became aware of certain allegations and concerns regarding the stability and viability of the Brooke entities.  (Trial Tr. Vol. 2, 263:4-265:24.)  When Brooke failed to distribute McCranie's commissions due in July 2008, McCranie sent multiple e-mails declaring that Brooke breached their obligations.  (*Id.*)  On September 2, 2008, McCranie sent letters to Brooke and Brooke Credit that he was terminating the Franchise Agreement and

18

requesting immediate transfer of the agent of record to him effective September

3, 2008, in order to preserve the collateral.  (Pl.'s Ex. 16 at 2-6.)  The letter to

Brooke Credit provided:

> As you the lender are aware my account with you is current.  I have
> an excellent eight year payment history with you.  Never have I been
> even one day late.  In order to continue honoring my loan
> agreement, I must have control of the commissions.

(*Id.* at 2.)  Despite his demands, the agent of record status was not transferred to

McCranie. (Trial Tr. Vol. 2, 271:8-271:12.)

19.    In September 2008, Home Federal stopped receiving payments from

Brooke Credit under the Participation Agreement.  (Haskell Dep. 22:11-22:17.)  In

October 2008, Brooke filed for bankruptcy in the District of Kansas.  (Trial Tr. Vol.

1, 68:9-68:14.)

20.    On October 1, 2008, DZ Bank informed McCranie that Brooke Credit

had sold his April 17, 2002 Note to Brooke Funding and that Brooke Funding had

pledged the Note to DZ Bank as collateral under the Amended Security

Agreement.  (Pl.'s Ex. 17; Trial Tr. Vol. 1, 70:19-72:5.)  DZ Bank directed

McCranie to submit all amounts due under the Note directly to DZ Bank.  (*Id.*)  As

of August 31, 2008, the outstanding principal was $481,232.18.  (Pl.'s Ex. 17.)

21.    On October 9, 2008, Home Federal issued separate demand letters

to McCranie (for payments under the Note) and to Brooke Credit (for the entire

loan file and any payments received under the Note) due to Brooke Credit's

failure to comply with its contractual obligations under the Participation

Agreement.  (Pl.'s Ex. 26, bates 207-08, 333-34; Haskell Dep. 22:18-24:9.)

Following its demand letters, Home Federal received no further payments on

McCranie's Note under the Participation Agreement.  (Haskell Dep. 25:10-25:14.)

In a report to the Board of Directors in regards to McCranie's Note, Home

Federal's Executive Vice President, Scott A. Haskell, stated in relevant part:

> 10/31/08 . . . . There is no new additional data from the borrower and
> this promissory note appears to have been sold multiple times.
> Based on my earlier visit with this borrower I believe that the
> borrower will walk away and no payments will be received.  I will call
> again to get an updated status report but feel it would be prudent to
> charge this off as of November 30, 2008.
> 11/30/08 . . . . We did not receive a file or original note.  Based on
> the number of banks calling the borrower this note was sold several
> times and whoever has the original note will be [t]he holder in due
> course.  This note was charged off on November 25, 2008.

(Pl.'s Ex. 21; Haskell Dep. 25:15-25:22.)

Based on Mr. Haskell's recommendation, McCranie's April 17, 2002 Note

in the principal sum of $488,862 was charged off (or written off) to zero, but was

still eligible for collection.  (Haskell Dep. 26:14-27:19.)  Home Federal never

pursued a legal action with respect to the Note because it wanted to avoid any

legal expenses and partly because it did not have possession of the original Note.

(Haskell Dep. 26:14-27:19, 36:22-37:2.)  No other creditors have asserted claims

with respect to McCranie's Note.  (Trial Tr. Vol. 1, 94:6-94:10.)

22.    Starting on October 13, 2008, McCranie began receiving suspension

notices from his insurance carriers, some of which became effective October 17, 2008.  (Def.'s Exs. 1-4; Trial Tr. Vol. 2, 284:25-286:1.)

23.    On October 14, 2008, McCranie received an Acknowledgment and Agreement from DZ Bank, but refused to execute it.  (Def.'s Ex. 5; Trial Tr. Vol. 2, 286:2-290:9.)  It provided, *inter alia*, that McCranie's loan had been assigned to Brooke Funding, which in turn had pledged it to DZ Bank.  (*Id.*)  It further provided that DZ Bank would consent to McCranie's termination of the Franchise Agreement and would assist McCranie with becoming the agent of record for the insurance policies serviced through Brooke, if McCranie acknowledged he was liable to DZ Bank under the Note.  (*Id.*)

24.    As a result of Brooke Funding's default on its obligations to DZ Bank under the Amended Security Agreement, on October 30, 2008, DZ Bank, as agent of the lender Autobahn Funding, Brooke Credit, and Brooke Funding, as debtor, entered into a Surrender of Collateral, Consent to Strict Foreclosure, Release and Acknowledgment Agreement ("Surrender of Collateral").  (Pl.'s Ex. 18; Trial Tr. Vol. 1, 69:4-69:18, 163:1-163:8.)  Pursuant to the Surrender of Collateral, DZ Bank had a first priority security interest in the collateral and was entitled to proceed immediately to foreclose upon the collateral in partial satisfaction of Brooke Funding's obligations under the Credit Agreement, which at that time amounted to almost $35 million.  (Pl.'s Ex. 18, bates 15, 23; Trial Tr. Vol. 1, 69:19-70:18, 85:19-86:6.)

25.   On October 31, 2008, DZ Bank and Brooke Funding entered into an Omnibus Assignment Agreement ("Omnibus Assignment"), whereby Brooke Funding conveyed to DZ Bank all right, title, and interest to the loans listed in Annex A, including McCranie's April 17, 2002 Note, the security interests in the collateral, the loan file related to each loan, and the proceeds of any and all of the foregoing.  (Pl.'s Ex. 19; Trial Tr. Vol. 1, 76:1-76:13; Trial Tr. Vol. 2, 315:9-316:5.)  At the trial, DZ Bank remained in possession of the original McCranie loan file, including the Note and Allonge thereto.  (Trial Tr. Vol. 1, 39:9-39:15, 59:4-59:10, 106:4-106:5.)

26.   On December 3, 2009, DZ Bank's attorneys sent a letter to McCranie in an attempt to collect on his April 17, 2002 Note.  (Pl.'s Ex. 27B, bates 804-08.)  The letter informed McCranie that his loan with Brooke Credit had been assigned to Brooke Funding, which had pledged it to DZ Bank.  (*Id.*)  The letter provided:

> As a result of [Brooke Funding's] default to DZ Bank, DZ Bank has foreclosed upon the Loan and is enforcing its rights thereunder.  As you are aware, you are in default under the terms of the Loan by failing to make payments when due.  The current balance due is $484,425.42, plus attorneys' fees, costs and prejudgment interest. . . . We trust that you will agree that it is in your best interest to contact us immediately to resolve this matter.

(*Id.*)  McCranie stamped the letter as "deficient" and added the following before sending it back to DZ Bank:

> This constitutes [a] timely response: 12-5-2009[.] I cannot make a legal determination about what you are asking me.
> Your offer of contract is being rejected and returned to you unsigned

22

> under regulation "Z" of the Federal Fair Debt Collection Practices
> Act.  Anyone who signed this document and writes in response to
> this must respond to me under penalties of perjury.
> MICHAEL MCCRANIE
> [signature]
> "With power of attorney in fact"

(Trial Tr. Vol. 1, 82:21-85:4; Trial Tr. Vol. 2, 200:15-200:25.)

27.    McCranie has not made any payments under the Note to DZ Bank. (Trial Tr. Vol. 1, 85:5-85:7, 94:3-94:5.)  McCranie testified at the trial that even though he terminated his agreement with Brooke, he would have made payments under the Note if the agent of record status had been transferred to him.  (Trial Tr. Vol. 2, 279:9-279:13.)  The balance due under McCranie's April 17, 2002 Note is $484,425.42 in principal, plus interest.  (Pl.'s Ex. 29.)

28.    DZ Bank has not foreclosed upon, or taken any action with respect to, the collateral pledged by McCranie under the October 30, 2000 Security Agreement.  (Trial Tr. Vol. 1, 86:7-86:23, 172:1-172:16.)

### III.  Conclusions of Law

1.    The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds $75,000 and is between a citizen (McCranie) of a State (Florida) and a citizen or subject (DZ Bank) of a foreign state (Germany).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because McCranie resides in this District and a substantial part of the events or omissions giving rise to DZ Bank's claim occurred in this District.

23

2.     Kansas substantive law applies in this case.

Under Kansas law: "The primary rule for interpreting written contracts is to ascertain the parties' intent.  If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction."  *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011). "Contracts should not be interpreted by isolating one particular sentence or provision, but by construing and considering the entire instrument."  *Byers v. Snyder*, 237 P.3d 1258, 1265 (Kan. Ct. App. 2010).  "Where ambiguity or uncertainty is involved, the parties' intentions are ascertained by considering the language employed, the circumstances existing when the agreement was made, the object sought, and other circumstances tending to clarify the parties' real intentions."  *Id.*

3.     DZ Bank bears the burden of proving that McCranie is liable under the Note by a preponderance of the evidence.  *See Student Loan Mktg. Ass'n v. Hollis*, 121 P.3d 462, 465 (Kan. Ct. App. 2005); *Hoke v. Zent*, 63 P. 1128, 1129-30 (Kan. Ct. App. 1901).

4.     McCranie's April 17, 2002 Note is a negotiable instrument. "Negotiable instrument" is defined in Section 84-3-104 of the Kansas Statutes as follows:

> (a) Except as provided in subsections (c) and (d), "negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described

24

in the promise or order, if it:
    (1) is payable to bearer or to order at the time it is issued or
first comes into possession of a holder;
    (2) is payable on demand or at a definite time; and
    (3) does not state any other undertaking or instruction by the
person promising or ordering payment to do any act in addition to the
payment of money, but the promise or order may contain (I) an
undertaking or power to give, maintain, or protect collateral to secure
payment, (ii) an authorization or power to the holder to confess
judgment or realize on or dispose of collateral, or (iii) a waiver of the
benefit of any law intended for the advantage or protection of an
obligor.

Kan. Stat. § 84-3-104.  Further, Section 84-3-106 of the Kansas Statutes

provides:

    (a)    Except as provided in this section, for the purposes of K.S.A.
    84-3-104(a), a promise or order is unconditional unless it states (1)
    an express condition to payment, (2) that the promise or order is
    subject to or governed by another writing, or (3) that rights or
    obligations with respect to the promise or order are stated in another
    writing.  A reference to another writing does not of itself make the
    promise or order conditional.
    (b)    A promise or order is not made conditional (1) by a reference
    to another writing for a statement of rights with respect to collateral,
    prepayment, or acceleration, or (2) because payment is limited to
    resort to a particular fund or source.

Kan. Stat. § 84-3-106.

    The April 17, 2002 Promissory Note is an unconditional promise by

McCranie to pay a fixed amount of money ($831,407.78), plus interest, to Brooke

Credit by April 1, 2014, and the purpose of the loan was to consolidate pre-

existing agency debt at a lower interest rate.  (Pl.'s Ex. 4; Stipulated fact (Doc.

143) #5; Trial Tr. Vol. 1, 35:1-37:8, 55:21-57:8; Trial Tr. Vol. 2, 193:14-194:2; Pl.'s

Ex. 5 at 657, ¶ 7.)  The reference to the Agreement for Advancement of Loan in the Note does not make the promise to pay conditional or indicate any impermissible undertakings.  *See A.I. Trade Fin., Inc. v. Laminaciones de Lesaca, S.A.*, 41 F.3d 830, 836 (2d Cir. 1994) ("[A] note containing an otherwise unconditional promise is not made conditional merely because it refers to, or states that it arises from, a separate agreement or transaction. . . . Given the precise terms on the face of the notes, the mere reference to the bill-of-lading date did not impair the notes' negotiability."); In re *AppOnline.com, Inc.*, 321 B.R. 614, 622 (E.D.N.Y. 2004) ("The distinction is between a mere recital of the existence of the separate agreement or a reference to it for information, which . . . will not affect negotiability, and any language which, fairly construed, requires the holder to look to the other agreement for the terms of payment."), *aff'd*, 128 F. App'x 171 (2d Cir. Jan. 24, 2004); *United States v. Cottrell*, 287 F. Supp. 877, 883 (E.D. Cal. 1968) ("A reference in a note to an extrinsic agreement does not destroy negotiability unless the reference actually makes the note 'subject to' the terms of that agreement. . . . This is so even though the security agreement may require the maker to do many acts other than the payment of money, i.e., covenants in a mortgage.").

McCranie's payment obligations are plainly stated on the face of the Note and there is no need to examine the Agreement for Advancement of Loan, or any other document, to calculate the amount due under the Note.  Further, there are

no impermissible undertakings because, as DZ Bank points out, the Agreement

for Advancement of Loan merely contains a statement of rights with respect to

preservation of collateral and McCranie's obligation to provide certain financial

reports and additional documents to the lender.  (Pl.'s Ex. 5, ¶¶ 10, 12.)

Although the Agreement for Advancement of Loan includes references to

other agreements, it incorporates only the agreements executed by and/or on

behalf of McCranie and delivered to Brooke Credit, *i.e.*, the "loan documents."

(Pl.'s Ex. 5, bates 3, 6-7, 11.)  Because Brooke Credit is not a party to either the

Agreement for Sale of Agency Assets or the Franchise Agreement, these

agreements are not considered incorporated into the Agreement for

Advancement of Loan.  Therefore, even if Brooke breached the Franchise

Agreement, it did not relieve McCranie of his obligations to Brooke Credit, and

ultimately to DZ Bank, under the Note.

5.      DZ Bank is a holder of McCranie's April 17, 2002 Note.  A holder is,

*inter alia*, "[t]he person in possession of a negotiable instrument that is payable

either to bearer or to an identified person that is the person in possession."  Kan.

Stat. § 84-1-201(b)(21).  Here, DZ Bank has possession of the original Note and

the Allonge, under which the Note is ultimately payable to DZ Bank, following its

transfer from Brooke Credit to Brooke Funding, and from Brooke Funding to DZ

Bank.

The Allonge was a proper endorsement of the Note.  As demonstrated at

the trial, the original Allonge was part of the original loan file, and the loan number

on the Allonge and on the Note matched.  (Pl.'s Ex. 4; Trial Tr. Vol. 1, 106:4-

106:5.)  Even if the Allonge was not originally attached to the Note,[9] the

endorsement is still valid because the parties intended that the documents be

attached, as shown by the matching loan number on the documents and their

appearance in the original loan file.  *See Kohler v. U.S. Bank Nat'l Ass'n*, 2013

WL 3179557, *6 (E.D. Wis. June 21, 2013) ("[E]ven if the allonges had not been

physically attached soon after execution . . . , the information on the allonges

established that they were intended to be affixed.  The sticker on each allonge

matches the allonge to the particular note signed by the Kohlers, with the

pertinent loan number.  Thus, the information on each allonge indicates an intent

to serve as an endorsement of the respective note. . . . The lack of a statement in

the allonge indicating that it was to be attached to the note is not persuasive; the

loan number referencing the same number on the note indicates such intent.");

*see also* In re *Nash*, 49 B.R. 254, 261 (D. Ariz. 1985).

Further, the parties intended to transfer the Note from Brooke Credit to

Brooke Funding and then to DZ Bank, as shown by the events surrounding the

Advance Request and the Custodian & Servicer's Certificate taking place on

February 19, 2008.  Once the Allonge was endorsed, making the Note payable to

---

[9] "For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument."  Kan. Stat. § 84-3-204(a).

DZ Bank, DZ Bank wired $416,947.14 to Brooke Funding for its purchase of the Note from Brooke Credit.  (Pl.'s Ex. 15; Trial Tr. Vol. 1, 65:24-66:15; Zierlein Dep. 33:23-34:22.)  The parties' intent to transfer the Note to DZ Bank is also evident from the Surrender of Collateral, pursuant to which DZ Bank held a first priority security interest in the collateral when Brooke Funding defaulted on its obligations under the Amended Security Agreement, and from the Omnibus Assignment, under which DZ Bank was transferred all rights, title, and interest to McCranie's loan, the security interest in the collateral, the loan file, and the proceeds of any and all of the foregoing.  (Pl.'s Ex. 18, bates 15, 23; Pl.'s Ex. 19; Trial Tr. Vol. 1, 69:19-70:18, 76:1-76:13, 85:19-86:6; Trial Tr. Vol. 2, 315:9-316:5.)

As shown earlier, the Allonge provided: "Pay to the order of [Brooke Funding], its successors and assigns . . . , without recourse (except as otherwise set forth in [the Amended Sale Agreement] . . . )."  (Pl.'s Ex. 4.)  The language "except as otherwise set forth in [the Amended Sale Agreement]" modifies the term "without recourse," not the word "pay."[10]  If the parties intended to create a conditional endorsement as McCranie suggests, they would have likely placed the "except" language before the word "pay."

Moreover, although the April 17, 2002 Note was ineligible for transfer from Brooke Credit to Brooke Funding and then to DZ Bank because both the Security

---

[10] Pursuant to Section 1.5 of the Amended Sale Agreement, no recourse could be taken except as specifically set forth therein.  (Pl.'s Ex. 11.)

29

Agreement and the Amended Security Agreement specifically exclude promissory notes "originated by [Brooke Credit] on or before August 30, 2004," the parties contemplated the possibility that ineligible loans could nevertheless be transferred, because Section 2.5(a) of the Amended Sale Agreement expressly provides for repurchase or substitution of ineligible notes with eligible ones.  (Pl.'s Ex. 11; Trial Tr. Vol. 1, 51:13-51:25.)  Had DZ Bank realized that the Note was ineligible, it could have asked for its repurchase or substitution.  (Trial Tr. Vol. 1, 52:1-52:7.)  However, the fact that it did not, does not void the transfer.

In any event, only the parties to the Amended Sale Agreement and their successors and assigns could assert a claim under the agreement.  Because McCranie was neither a party nor a secured party to the Amended Sale Agreement (as well as the Sale Agreement, the Security Agreement, and the Amended Security Agreement), he cannot assert a legal or equitable claim thereunder.  (Trial Tr. Vol. 1, 60:12-61:2.)

In addition, McCranie has failed to establish that he has standing to bring a claim under those agreements as an intended third-party beneficiary.  *See Byers*, 237 P.3d at 1265 (stating that "only intended beneficiaries have standing to sue for damages resulting from the breach of a contract" and "[t]he burden of establishing standing to bring suit as a third-party beneficiary rests with the party asserting it").  "[P]arties are presumed to contract for themselves, and their intent that a third person receive a direct benefit must be clearly expressed in the

30

contract." *Id.*

Here, Section 8.6 of the Amended Sale Agreement expressly provides that only the parties thereto and their respective successors and permitted assigns have any legal or equitable right, remedy, or claim under the agreement. (Pl.'s Ex. 11, bates 704.) Therefore, non-parties, like McCranie, lack standing to bring any claim under the agreement. *See Livonia Prop. Holdings, L.L.C. v. 12840-12976 Farmington Rd. Holdings, L.L.C.*, 717 F. Supp. 2d 724, 737 (E.D. Mich. 2010) (holding that a borrower lacks standing to challenge the validity of assignments to which it was not a party or third-party beneficiary, where it has not been prejudiced, and the parties to the assignments do not dispute their validity).

6.     DZ Bank is a holder in due course of the April 17, 2002 Note. Under Section 84-3-302(a) of the Kansas Statutes:

> [A] "holder in due course" means the holder of an instrument if:
> (1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and
> (2) the holder took the instrument (A) for value, (B) in good faith, (C) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (D) without notice that the instrument contains an unauthorized signature or has been altered, (E) without notice of any claim to the instrument described in K.S.A. 84-3-306, and (F) without notice that any party has a defense or claim in recoupment described in K.S.A. 84-3-305(a).

Kan. Stat. § 84-3-302(a).

Here, the Note is free of forgery and alteration, and its authenticity is not

questioned.[11]  (*See* Trial Tr. Vol. 2, 195:8-195:18.)  In addition, DZ Bank took the

Note for value on February 20, 2008, when it advanced $416,947.14 in the

regular course of its business as agent for Autobahn Funding for Brooke

Funding's purchase of the Note under the Amended Security Agreement, in

exchange for Brooke Funding's endorsement of the Allonge and transfer of the

original Note and Allonge to DZ Bank's custodian Textron as collateral.  *See*

*Bricks Unlimited, Inc. v. Agee*, 672 F.2d 1255, 1258 (5th Cir. 1982) ("[A] holder

who takes a negotiable instrument as collateral for a loan takes 'for value' . . . .").

At that time, DZ Bank was not aware of any financial difficulties or

wrongdoing by any of the Brooke entities and its expectation was that Brooke

Funding would repay its debt under the Amended Security Agreement.  (Trial Tr.

Vol. 1, 93:15-94:2, 171:9-171:22; Zierlein Dep. 44:6-45:1, 155:6-156:9.)  In

---

[11] At the trial, McCranie questioned the completeness of the loan documents, stating that the Agreement for Advancement of Loan, the Security Agreement, and the Security Agreement Addendum were no longer attached to his Promissory Notes, thereby altering the terms of the Notes.  (Trial Tr. Vol. 2, 188:8-189:4, 194:10-195:18.)  This goes to McCranie's argument that there was a collective, integrated, and conditional agreement to purchase agency assets, which the Court rejects.  As stated recently in *DZ Bank AGDeutsche Zentral-Genossenschaftbank, Frankfurt Am Main v. Choice Cash Advance, LLC*:

> Although the Franchise Agreement and the Loan Agreement were
> executed on the same day, there is no evidence that performance of one
> agreement was contingent upon performance of the other.  Specifically,
> there is no evidence that Choice Insurance's performance of the Loan
> Agreement was subject to BCC's performance of the Franchise
> Agreement. . . . [T]he two contracts are separate.  Each contains separate
> promises and separate consideration, and significantly, each contains its
> own integration clause.

918 F. Supp. 2d 1156, 1167-68 (W.D. Wash. 2013).

addition, at that time, DZ Bank did not have notice of Home Federal's interest in the Note because Home Federal did not file a UCC Financing Statement and nothing on the face of the Note suggested that it had been sold to Home Federal. Therefore, DZ Bank took the Note in good faith and without notice of any claims or defenses.  *See Third Nat'l Bank in Nashville v. Hardi-Gardens Supply of Illinois, Inc.*, 380 F. Supp. 930, 941 (M.D. Tenn. 1974) ("'Notice' means notice at the time of the taking, the time of the negotiation of the note[.]"); *see also Bricks Unlimited, Inc.*, 672 F.2d at 1259 ("Knowledge learned subsequent to the time of negotiation of an instrument does not impair holder in due course status."). Because DZ Bank took the Note for value, in good faith, and without notice of any claims or defenses, DZ Bank is a holder in due course of the April 17, 2002 Note.

As such, DZ Bank's interest in the Note is superior to Home Federal's 99.74% interest under the Participation Agreement.  *See* Kan. Stat. § 84-3-203(d) ("If a transferor purports to transfer less than the entire instrument, negotiation of the instrument does not occur.  The transferee obtains no rights under this article and has only the rights of a partial assignee.").  DZ Bank's interest is also superior because Home Federal never took possession of the original Note, while DZ Banks gave value and took possession of the Note and the Allonge in good faith and without knowledge that the purchase may have violated Home Federal's rights.  *See* Kan. Stat. § 84-9-330(d) ("[A] purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than

possession if the purchaser gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party."). Further, in light of its status as a participant bank, Home Federal lacks standing to enforce the Note against McCranie. *See First Bank of WaKeeney v. Peoples State Bank*, 758 P.2d 236, 238 (Kan. Ct. App. 1988) ("The participant bank has no legal relationship with the borrower. The borrower's and participant's relationships are solely with the lead bank.").

7.      DZ Bank, as named in the First Amended Complaint (Doc. 151), has standing to enforce the Note.

8.      McCranie breached the Note. Under Kansas law, the elements of a breach of contract claim are: (1) existence of a contract, (2) sufficient consideration to support the contract, (3) plaintiff's performance or willingness to perform in compliance with the contract, (4) defendant's breach of the contract, and (5) damages to plaintiff caused by the breach. *City of Andover v. Sw. Bell Tel., L.P.*, 153 P.3d 561, 565 (Kan. Ct. App. 2007). All of these elements have been satisfied in this case.

First, McCranie, as borrower, and Brooke Credit, as lender, entered into the Promissory Note (loan number 2752) on April 17, 2002, under which Brooke Credit loaned McCranie $831,407.78 to consolidate pre-existing agency debt at a lower interest rate. (Pl.'s Ex. 4; Stipulated fact (Doc. 143) #5; Trial Tr. Vol. 1, 35:1-37:8; Trial Tr. Vol. 2, 193:14-194:2.) The Note was payable to Brooke

Credit or its successors and assigns.  (Pl.'s Ex. 4.)  Following the transfer of the

Note from Brooke Credit to Brooke Funding and then to DZ Bank, which was

accomplished through the Allonge in February 2008, DZ Bank became a holder in

due course of the Note, and has standing to enforce the Note.  (*Id.*)

Second, there was sufficient consideration to support the Note.[12]

"[C]onsideration is sufficient if there is a benefit to the debtor or an inconvenience

or deprivation to the creditor."  *State of Kan. ex rel. Ludwick v. Bryant*, 697 P.2d

858, 861 (Kan. 1985).  There is consideration in this case because McCranie

benefitted from the funds received under the Note — it refinanced his pre-existing

debt at a lower interest rate.

Third, DZ Bank performed its obligations as assignee of Brooke Credit and

---

[12] McCranie argues "there was a lack of consideration to support the collective, integrated and conditional agreement to purchase agency assets, and its sub-parts including the Promissory Note," because he never took ownership and control of the insurance agency assets he contracted to purchase.  (Doc. 170 at 17.)  Preliminarily, the Court does not interpret the evidence as supporting a "collective, integrated and conditional agreement."  Moreover, although McCranie did not receive the agent of record status, which would have happened after the loan was repaid (Trial Tr. Vol. 1, 131:13-131:18), he did receive agency assets in the form of commissions (Trial Tr. Vol. 2, 197:25-198:11, 257:24-258:6), as well as the funds to purchase the agency.  Further, McCranie entered into the subject agreements as an experienced, sophisticated businessman who understood the terms of the agreements and was satisfied with the contract arrangements for years, up until the payments stopped in 2008.  (*See* Trial Tr. Vol. 2, 192:16-193:2, 196:18-197:1.)  In fact, McCranie's counsel inspected the Promissory Note the day before it was signed and opined that the loan documents were valid and enforceable against McCranie.  (Pl.'s Ex. 5 at 657, ¶ 7.)  Under these circumstances, McCranie understood that the agent of record status would not be transferred to him until the loan was fully repaid, but he nevertheless entered into the agreements and made his payments as agreed.  (*See* Pl.'s Ex. 16 at 2 ("I have an excellent eight year payment history with you.  Never have I been even one day late.").)  Therefore, McCranie's argument as to lack of consideration is rejected.

Brooke Funding by providing the funds as agreed and otherwise acting in

accordance with the terms of the Note.  As an affirmative defense, McCranie

alleges that his performance under the Note is excused by the doctrine of good

faith and fair dealing because DZ Bank and/or its alleged predecessors took

actions that destroyed the benefit of McCranie's bargain and prevented him from

carrying out his obligations.  (Doc. 156 at 4; Doc. 170 at 17-18.)  However, due to

DZ Bank's holder in due course status, all of McCranie's affirmative defenses[13]

fail under Kan. Stat. § 84-3-305(a)(1).  The only permissible defenses under

Section 84-3-305(a)(1) are:

> (A) infancy of the obligor to the extent it is a defense to a simple
> contract, (B) duress, lack of legal capacity, or illegality of the

---

[13] McCranie raises fourteen affirmative defenses: (1) DZ Bank lacks standing to bring this action; (2) the alleged contract is part of a single, integrated, collective, and conditional agreement for the purchase of insurance agency assets; (3) McCranie's performance is excused due to DZ Bank and/or its alleged predecessors in interest's and Brooke's material breach, which led McCranie to terminate or cancel any further obligations under the contract; (4) McCranie's performance is excused due to the doctrine of impossibility of performance; (5) McCranie's performance is excused pursuant to the doctrine of commercial frustration; (6) DZ Bank is barred from recovery because it and/or its alleged predecessors in interest violated the implied covenant of good faith and fair dealing; (7) the contract is unenforceable and/or void because of DZ Bank's misrepresentations; (8) DZ Bank is barred from recovery by reason of unclean hands; (9) the contract between DZ Bank and/or its alleged predecessors in interest and McCranie lacked adequate consideration; (10) DZ Bank and/or its alleged predecessors in interest did not act in good faith and violated the UCC by failing to adequately preserve the collateral and/or assure performance; (11) DZ Bank is required to account for all collateral received, including, but not limited to, payments received and other agency assets, and McCranie is owed any surplus; (12) DZ Bank and/or its alleged predecessors in interest failed to act in a commercially reasonable manner; (13) DZ Bank is unable to establish damages in that it has been made whole; and (14) McCranie is entitled to a set-off or a claim of recoupment for amounts previously paid under the contract.  (Doc. 156 at 3-5.)

> transaction which, under other law, nullifies the obligation of the
> obligor, (C) fraud that induced the obligor to sign the instrument with
> neither knowledge nor reasonable opportunity to learn of its
> character or its essential terms, or (D) discharge of the obligor in
> insolvency proceedings[.]

Kan. Stat. § 84-3-305(a)(1).  McCranie does not raise any of these defenses.

Even assuming that McCranie could properly raise any of his fourteen affirmative defenses, he has failed to prove those defenses.  For example, to the extent he alleges that Brooke breached its obligations under the Franchise Agreement, it is unclear how Brooke Credit and/or DZ Bank, neither of whom is a party to the agreement, would be liable for Brooke's acts or omissions.

Fourth, McCranie breached the Promissory Note by failing to make or ensure that payments were made under the Note to DZ Bank.  McCranie testified that in accordance with the Franchise Agreement, he did not personally make any payments under the Note because the payments were always made out of his commissions.  (Trial Tr. Vol. 2, 198:1-198:11.)  Although the Franchise Agreement provided for the creation of a Receipts Trust Account and made Brooke the Agent of Record, this agreement was not a part of the loan documents, which obligated McCranie to make payments under the Note through April 1, 2014.  As stated earlier, even if there was a breach under the Franchise Agreement, it did not excuse McCranie's obligations under the Note.

Fifth, as a result of McCranie's breach, DZ Bank has been damaged in the principal amount of $484,425.42, plus interest.  (Pl.'s Ex. 29; Trial Tr. Vol. 2,

204:14-204:24, 313:18-313:23.)  Contrary to McCranie's argument, the evidence does not show that his loan has been paid off; rather, it shows that the loan has been charged off or written off.   (*See* Def.'s Ex. 10; Trial Tr. Vol. 2, 208:3-209:3, 313:1-313:23; *see also* Haskell Dep. 26:14-27:19.)  In addition, there is no evidence that DZ Bank has received any sum under the "Lender's Financial Guaranty Policy" from DB Indemnity, Ltd., for McCranie's loan.  (*See* Def.'s Ex. 10.)

## IV.  The Court's Decision

DZ Bank has satisfied its burden of proof, by a preponderance of the evidence, that McCranie breached his obligations under the April 17, 2002 Promissory Note.  As a result, DZ Bank has been damaged in the principal amount of $484,425.42, plus interest.  **Within fourteen (14) days** of the date of this Order, DZ Bank shall provide the Court with a proposed judgment.  DZ Bank may file a properly supported motion for attorneys' fees and/or costs in accordance with Fed.R.Civ.P. 54.

**DONE AND ORDERED** at Jacksonville, Florida, on September 6, 2015.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record

38